**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| TECHNOLOGY AND TELECOMMUNICATIONS CONSULTANTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ELEVATE GROUP, LLC d/b/a ELEVATE TECHNOLOGY SOLUTIONS,<br><br>Defendant. | ) | No. 1:26-cv-12569-JEK |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, DEFENDANT'S MOTION TO STRIKE, AND DEFENDANT'S MOTION TO DISMISS**

**KOBICK, J.**

Plaintiff Technology and Telecommunications Consultants, Inc. ("TTC") brings this breach of contract action against defendant Elevate Group, LLC d/b/a Elevate Technology Solutions for wrongful termination of the parties' agreement. TTC alleges that Elevate materially breached that agreement by, among other things, failing to extend its term and issue a proper notice of termination. Pending before this Court are TTC's motion for a preliminary injunction, Elevate's motion to strike the declarations that TTC submitted with its reply brief, and Elevate's motion to dismiss. For the reasons that follow, the Court will deny TTC's preliminary injunction motion, deny Elevate's motion to strike, and grant in part and deny in part Elevate's motion to dismiss.

A preliminary injunction is unwarranted because TTC fails to demonstrate that it would suffer irreparable harm without an injunction, its likelihood of success on the merits is uncertain given the disputed factual issues in the current record, and the balance of the hardships favors

Elevate. Since TTC's supplemental declarations and exhibits do not affect this conclusion, Elevate's motion to strike will be denied. The declaratory judgment claim in Count I will be dismissed because 28 U.S.C. § 2201 does not create a cause of action. Treated as a single claim for breach of contract, Counts II and III survive dismissal because TTC plausibly alleges that Elevate breached the parties' agreement.

## BACKGROUND

### I. Factual Background.

The following facts are drawn from the verified complaint, the exhibits attached to it, and solely for purposes of the preliminary injunction motion, the parties' evidentiary submissions.

TTC has provided Information Technology ("IT") services to private companies and the federal government, including the United States Air Force ("USAF"), for over two decades. ECF 1, ¶¶ 7, 14-15. It has received exceptional past performance reviews from USAF for those services. *Id.* ¶ 15. Elevate also offers "technology solutions to the federal marketplace and [private] industries." *Id.* ¶ 9 (quotation marks omitted).

On March 7, 2023, USAF solicited contractors for IT and command-and-control operations at Nellis Air Force Base. *Id.* ¶ 16. Seeking to jointly respond to the solicitation, Elevate and TTC entered into a Teaming Agreement six days later, agreeing to have Elevate serve as the prime contractor and TTC as the subcontractor. *Id.* ¶¶ 18, 22-24; *see* ECF 1-1. After submitting their joint proposal on April 17, 2023, they were awarded the USAF contract exactly four months later. ECF 1, ¶¶ 35, 37. On October 25, 2023, before that contract began, Elevate and TTC executed a Subcontract. *Id.* ¶ 39; *see* ECF 1-2. Under the Subcontract, the period of performance includes a Base Period from November 1, 2023 to April 30, 2024, and then four year-long Option Periods, with the first running from May 1, 2024 to April 30, 2025. ECF 1, ¶ 43; ECF 1-2, Art. 1.4. The

Base Period and Option Periods for the Subcontract are the same as for the contract with USAF. ECF 1, ¶ 44.

Several provisions of the Subcontract bear on this case. In Article 1.1, TTC agreed to "provide the personnel assigned by [a] Task Order" set forth in the attached Performance Work Statement ("PWS"). ECF 1-2, Art. 1.1. Article 1.5 states that if USAF "exercises its option period(s) with [Elevate], then [Elevate] shall extend the term of this Agreement for the same option period(s) by issuing a modification to this Agreement to [TTC] prior to the Agreement expiration if [TTC] has performed to the satisfaction of [Elevate], and with no objections from" USAF. *Id.*, Art. 1.5. Article 2.4.1 provides that "[a]ll claims, disputes, controversies, or other matters in question arising out of, connected with, or relating to this Agreement shall be resolved by the Parties through face-to-face negotiations between senior executives (CEO/Managing Partner of [Elevate] and CEO of [TTC]) of each party." *Id.*, Art. 2.4.1. Article 2.5.3 permits termination of the Subcontract if Elevate notifies TTC in writing that TTC "is not performing to [its] satisfaction as determined by the [TTC] issued PWS service summary and deliverables." *Id.*, Art. 2.5.3. That Article further gives TTC at least fourteen days to cure "after receipt of the notice" and permits termination if TTC "fails to cure such Breach within this period." *Id.*; *see id.*, Art. 2.21 (requiring written notices). Article 2.5.7 states that the "rights and remedies of the Parties provided in Article 2.5 will not be exclusive and are in addition to any other rights and remedies provided by law or equity or otherwise under this Agreement." *Id.*, Art. 2.5.7.

Article 2.6 is a non-solicitation provision, prohibiting either party from "knowingly" soliciting or hiring "any employees of the other party to whom the hiring party was introduced as a result of the activities contemplated by this Agreement, except with the prior written approval of the other party." *Id.*, Art. 2.6. In pertinent part, Article 2.10 forbids TTC from discussing with

USAF—without Elevate's "written consent"—the Subcontract, any "matter that may adversely impact [Elevate's] relations with" USAF, or "any matters related to this effort." *Id.*, Art. 2.10. Article 2.13 further bars TTC from "directly or indirectly circumvent[ing]" Elevate's contract with USAF and requires TTC to "immediately notify [Elevate] in writing" if TTC "is contacted by or has any contact with another party concerning" the USAF contract or Elevate's "Confidential Information." *Id.*, Art. 2.13.

TTC satisfactorily performed its contractual obligations from November 1, 2023 to April 30, 2026—the Base Period through Option Period 2 of the Subcontract. ECF 1, ¶¶ 55-56. As a result, in January 2026, Elevate sent TTC a new teaming agreement to execute for the potential USAF recompete, in the event that USAF reopens the expiring contract to new bids. *Id.* ¶¶ 57 & n.2, 58. Before signing on, TTC wanted to address some "operational issues," including "Elevate's invoicing practices, procedures governing Elevate's approval of TTC personnel, and a disconnect between Elevate and TTC regarding TTC's positions under the Subcontract." *Id.* ¶¶ 59-60. TTC requested an in-person meeting, but—TTC alleges and Elevate disputes—TTC did not invoke Article 2.4.1. *Id.* ¶¶ 61-62; *see, e.g.*, ECF 1-3, at 2. On March 10, 2026, TTC's Chief Operating Officer ("COO") and Managing Partner, Ray Turner, met with Elevate to resolve these operational issues. ECF 1, ¶ 70. Yet Elevate wanted to discuss the recompete instead and continued that month to advocate for the new teaming agreement. *Id.* ¶¶ 71, 82-83.

On April 27, 2026, Elevate sent TTC a "Notice of Termination for Cause." *Id.* ¶ 86; *see* ECF 1-3. The termination notice asserts, and Elevate maintains, that TTC had materially breached the Subcontract by failing to send TTC's Chief Executive Officer ("CEO"), Sheri Robinson, to participate in the parties' negotiations in March 2026 as required by Article 2.4.1. ECF 1-3, at 3-4; *see* ECF 24, ¶ 21. The notice also invokes Article 2.5.3 and states that TTC attempted to undercut

Elevate by communicating with USAF and a competitor without Elevate's consent and potentially disclosing Elevate's proprietary information, which would violate Articles 2.10 and 2.13. ECF 1-3, at 3-4. According to Elevate's CEO and Managing Partner, Michael McCabe, TTC could not have had such communications "without discussing or exploiting the incumbent effort's scope, staffing model, workshare, structure, pricing posture, performance realities, team composition, and competitive position." ECF 24, ¶ 49. Because these breaches were "not capable of meaningful cure," the notice of termination adds, Elevate "ha[d] no choice but to terminate the Subcontract for cause . . . effective at the conclusion of the current option period, i.e., as of close of business May 8, 2026." *Id.* at 1, 4.

TTC characterizes the notice as a "pretextual and retaliatory" response to its refusal to enter into a new teaming agreement with Elevate. ECF 1, ¶ 113. According to TTC, Turner—who attended the March 10, 2026 meeting with Elevate—had the requisite authority to resolve the disputed issues under Article 2.4.1. *Id.* ¶¶ 95-103. And, TTC alleges and its CEO Robinson avers, TTC did not have any improper communications with USAF or Elevate's competitor about the Subcontract in violation of Articles 2.10 or 2.13. *Id.* ¶¶ 105-109; ECF 36, ¶¶ 48-49. TTC also claims that the termination notice violated Article 2.5.3 because it neither specifies any dissatisfaction with TTC's deliverables nor affords TTC the requisite fourteen days to cure. ECF 1, ¶¶ 110-12.

TTC further claims that Elevate violated Article 1.5 by failing to exercise Option Period 3 from May 1, 2026 to April 30, 2027 after USAF exercised that Option around April 20, 2026. *Id.* ¶¶ 115-18, 139. Elevate instead proposed modifying TTC's term to cover only May 1 through May 8, 2026. *Id.* ¶ 119. That proposal did not extend the Subcontract for the same one-year period as the contract with USAF. *Id.* ¶ 120. Nor did TTC receive the proposal until May 1, 2026—a day

after Option Period 2, and the Subcontract, expired. *Id.* ¶¶ 122-23. Without an agreement in place, TTC allegedly lacked a contractual right to reimbursement or indemnification. *Id.* ¶¶ 125-26, 137.

On May 4, 2026, TTC responded to the notice of termination, asserting that Elevate lacked valid grounds to terminate the Subcontract and requesting that the termination be undone. *Id.* ¶ 141; *see* ECF 26-2. The letter gave Elevate two days—until May 6—to respond. ECF 26-2, at 8. Yet on May 5, after learning that its employees had allegedly been told by Elevate that the Subcontract had been terminated, TTC issued a stop work order to those employees. ECF 1, ¶¶ 133-34, 138. Elevate disputes having made such statements. ECF 25, ¶ 5. On May 6, Elevate responded to TTC's letter, refusing to reinstate the Subcontract. ECF 26, ¶¶ 17-24.

## II. **Procedural History.**

Invoking diversity jurisdiction, TTC filed this action against Elevate on June 5, 2026. ECF 1.[1] The complaint asserts a declaratory judgment claim under 28 U.S.C. § 2201 (Count I) and two breach of contract claims—one seeking specific performance or injunctive relief (Count II) and the other alternatively requesting damages (Count III). *Id.* ¶¶ 157-88.

TTC also moved for a preliminary injunction that same day to enjoin Elevate from terminating the Subcontract and to order Elevate to exercise Option Period 3. ECF 7. After being served a week later, Elevate opposed that motion on June 26, 2026 and TTC filed a reply brief on July 9, 2026. ECF 9, 22, 35. The parties have also submitted numerous declarations. ECF 8-1, 8-2, 8-3, 23-26, 36-41. On July 13, 2026, Elevate moved to strike the declarations that TTC filed in

[1] The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, as the complaint demands $1 million. ECF 1, ¶ 188, and at 28; ECF 2, at 1. There is also complete diversity of citizenship. TTC is incorporated and principally based in Virigina. ECF 1, ¶ 6. And as a limited liability company, Elevate is a citizen of Massachusetts and New Hampshire, where its three members reside. *Id.* ¶ 8; ECF 48.

connection with its reply. ECF 46. TTC opposed that motion two days later. ECF 49. The Court later held a hearing and took the preliminary injunction motion under advisement. ECF 50.

Separately, Elevate moved to dismiss the complaint for failure to state a claim on July 2, 2026. ECF 32. TTC opposed that motion, and with leave of Court, Elevate filed a reply brief. ECF 52, 55.

## DISCUSSION

### I. __TTC's Motion for a Preliminary Injunction.__

TTC moves for a preliminary injunction, which "is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To secure a preliminary injunction, TTC bears the burden to demonstrate "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quotation marks omitted). The first and second factors are "the most important." *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009). Likelihood of success on the merits "weighs most heavily in the preliminary injunction analysis." *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy," *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005), and it is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009).

TTC has not demonstrated an entitlement to preliminary injunctive relief. The parties agree that, in accordance with the Subcontract's choice of law provision, TTC's breach of contract claim is governed by the law of Massachusetts. *See* ECF 1-2, Art. 2.4.3. To prevail on this claim under Massachusetts law, TTC must establish (1) the existence of an agreement between it and Elevate, supported by consideration; (2) it was "ready, willing, and able to perform" its contractual obligations; (3) Elevate nevertheless breached the contract; and (4) the breach harmed it. *477 Harrison Ave., LLC v. JACE Bos., LLC*, 483 Mass. 514, 523 (2019). TTC argues that Elevate wrongly terminated the Subcontract and materially breached Articles 1.5, 2.5.3, and 2.6 of the Subcontract. Elevate, on the other hand, contends that termination was appropriate because TTC materially breached the Subcontract first by violating Articles 2.4.1, 2.10, and 2.13.

In Massachusetts, a "material breach" of a contract by one party "excuse[s] the nonbreaching party from its obligations for further performance under the contract." *Bus. Interiors Floor Covering Bus. Tr. v. Graycor Constr. Co. Inc.*, 494 Mass. 216, 228 n.10 (2024). A "material breach of a contract occurs when the breach concerns an essential and inducing feature of the contract," which is "so serious and so intimately connected with the substance of the contract that a failure to uphold the provision would justify the other party walking away from the contract and no longer being bound by it." *G4S Tech. LLC v. Massachusetts Tech. Park Corp.*, 479 Mass. 721, 733-34 (2018) (citation modified). For "'an immaterial breach, . . . the injured party is entitled to bring an immediate action for damages'" but "'may not stop performing its obligations under the agreement.'" *Duff v. McKay*, 89 Mass. App. Ct. 538, 547 (2016) (quoting *Lease-It, Inc. v. Massachusetts Port Auth.*, 33 Mass. App. Ct. 391, 396 (1992)). "Whether a party has committed a material breach ordinarily is a question of fact." *EventMonitor, Inc. v. Leness*, 473 Mass. 540, 546 (2016). If "'the evidence on the point is either undisputed or sufficiently lopsided,'" however, "'the

court must intervene and address what is ordinarily a factual question as a question of law.'" *Id.* (quoting *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006)).

The evidentiary record here is not so lopsided and reveals disputes of material fact that render TTC's likelihood of success on the merits uncertain at this early juncture. *See Spencer Cos., Inc. v. Armonk Indus., Inc.*, 489 F.2d 704, 707 (1st Cir. 1973) (affirming denial of preliminary injunctive relief where there was "a major factual dispute" and "uncertainty whether [plaintiff] would ever prevail on the merits"). For example, it is disputed whether TTC had improper communications with the government and Elevate's competitor and, if so, whether those communications harmed Elevate and disclosed Elevate's proprietary information. Elevate asserts in the termination notice that TTC sought "to undermine" it through "material breaches" involving "unauthorized communications with [USAF] and competitors and potential disclosure or use of [its] confidential and capture-related information." ECF 1-3, at 3-4. Elevate's meeting notes similarly state that TTC's COO, Turner, disclosed on March 10, 2026 that TTC previously had discussions with "a competitor company" and USAF's "contract officer." ECF 23-1, at 2. Elevate CEO McCabe attests that "one cannot have those discussions with the Government and a competitor without discussing or exploiting the incumbent effort's scope, staffing model, workshare, structure, pricing posture, performance realities, team composition, and competitive position." ECF 24, ¶ 49. TTC CEO and Managing Partner Robinson, who met with the USAF representative, denies having made such improper disclosures. ECF 36, ¶¶ 48-49. Turner further avers that he informed Elevate's Vice President of Business Development, Patrick Minney, of his communication with Elevate's competitor in September 2025. ECF 37, ¶¶ 21-23. But if Elevate is correct, TTC may have violated Articles 2.10 and 2.13 by communicating with USAF and Elevate's competitor without Elevate's "prior written consent" in a manner that "adversely

impact[ed] [Elevate's] relations with" USAF or "directly or indirectly circumvent[ed]" Elevate's contract with USAF. ECF 1-2, Arts. 2.10, 2.13.

It is also disputed whether TTC was performing satisfactorily under the Subcontract. In TTC's view, Elevate breached Article 1.5 by failing to exercise Option Period 3 after USAF exercised its option to extend the contract. But under that provision, Elevate need only modify the term accordingly if TTC "has performed to [Elevate's] satisfaction." *Id.*, Art. 1.5. TTC takes the position, based on Article 2.5.3, that "satisfaction" must be "determined by [TTC] issued PWS service summary and deliverables." *Id.*, Art. 2.5.3; *see* ECF 1, ¶ 114. Article 1.5, however, does not define "satisfaction." A material factual dispute therefore exists about whether TTC was performing adequately, such that Elevate was required to extend the Subcontract's term.

The parties further contest whether TTC followed Article 2.4.1, which requires that matters be resolved "through face-to-face negotiations between senior executives (CEO/Managing Partner of [Elevate] and CEO of [TTC]) of each Party." ECF 1-2, Art. 2.4.1. According to Elevate's termination notice, TTC breached this provision twice by failing to send TTC's CEO to participate in such negotiations on March 10 and 16, 2026. ECF 1-3, at 3-4; *see* ECF 24, ¶ 21. TTC maintains that while it "requested an in-person meeting, it did not invoke the dispute-resolution procedures in Article 2.4.1 . . . because the operational issues it sought to address were not bona fide disputes, but matters [it] wanted Elevate to address and, if necessary, adjust under the Subcontract and any potential future subcontracts." ECF 1, ¶ 62; *see id.* ¶¶ 95-96. The parties' disagreement reflects a material dispute as to whether TTC invoked and, in turn, violated Article 2.4.1.

The Court need not decide these contested factual issues at this stage because TTC has failed to establish that it would suffer irreparable harm without an injunction. *See González-Droz*, 573 F.3d at 79 ("[I]n most cases, irreparable harm constitutes a necessary threshold showing for

an award of preliminary injunctive relief.'" (quotation marks omitted)); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("[T]he predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem."). TTC contends that it will likely experience irreparable injury to its reputation, goodwill, and ability to compete for future government contracts absent preliminary injunctive relief. TTC CEO Robinson attests that the company would be unable "to cite its performance under the Subcontract as past performance for future government contracts"—which federal "agencies rely on" and "is a mandatory evaluation factor under the" governing regulations—and the "value of past performance cannot be easily measured or compensated by monetary damages." ECF 8-1, ¶¶ 48-49; *see* 48 C.F.R. § 15.304(c)(3)(i) ("Past performance . . . shall be evaluated in all source selections for negotiated competitive acquisitions[.]"). TTC's Vice President and Chief Financial Officer, Frank Vella, also avers that "when performance under a federal subcontract ends early and under dispute, customers, partners, and future counterparties may ask why the work ended before the option period was complete." ECF 38, ¶ 19.

Such harms are too "speculative" to qualify as irreparable injury. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991) (quotation marks and brackets omitted). While courts have found "injuries to goodwill and reputation" irreparable because they "are not easily quantifiable," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000), those injuries "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 180 F.4th 348, 352 (1st Cir. 2026) (quotation marks omitted). TTC fails to identify a specific contract that will be affected in the near future. That federal contractors "may" question TTC's past performance under the Subcontract in future bids does not equate to

irreparable reputational injury now. ECF 38, ¶ 19; *see Ross-Simons*, 102 F.3d at 19 ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.").

TTC's principal reliance on *Beacon Associates, Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018), is therefore misplaced. In that case, the court found irreparable harm where the defendant terminated the parties' subcontract because it "left a black mark on [the plaintiff's] reputation" that would cause "many lost contract opportunities." *Id.* at 288. But unlike here, the plaintiff there identified "specific government contract opportunities for which [it] intended to compete," including a contract with the Federal Emergency Management Agency that had proposals due within weeks. *Id.* at 282-83, 288-89. TTC identifies no such imminent contracts. At the motion hearing, counsel for TTC represented that the next contract for which it planned to bid—recompeting for the existing USAF contract—was in 2028. *See* ECF 1, ¶ 57 (recompete on April 30, 2028). Robinson attests that "any potential recompete [is] nearly two years away," ECF 8-1, ¶ 25, and wrote to Elevate in February 2026, "[t]here isn't a rush – we are good year and a half out," *id.*, Ex. A, at 21. Accordingly, TTC has failed "to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted); *see Am. Chemistry Council, Inc. v. Nat'l Acad. of Scis.*, No. 23-cv-2113-JDB, 2024 WL 1141465, at *15 (D.D.C. Mar. 15, 2024) (distinguishing *Beacon Associates* on the ground that "the business owners [there] were faced with specific, identifiable, and demonstrable harms").

The balance of equities considers "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15. Elevate CEO McCabe avers that "forcing Elevate to continue working with TTC . . . would create serious operational risk, undermine orderly administration of the contract, and threaten additional

disruption to the Government's mission." ECF 24, ¶ 106. TTC CEO Robinson questions such hardships, attesting that Elevate could restore TTC's workshare percentage for Option Period 3 without necessarily having to rebadge TTC's former employees. ECF 36, ¶ 105. The Court agrees with Elevate that reorganizing the existing workforce on the USAF contract poses a serious hardship to Elevate. It is possible that such harm "is a predictable consequence of [Elevate's] breach." *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 120 (D. Mass.) (citation modified), *aff'd*, 118 F.4th 416 (1st Cir. 2024). However, as discussed, there are disputed facts regarding which party materially breached the Subcontract first. Thus, based on the existing record, the hardship felt by Elevate outweighs the harm that TTC would suffer absent a preliminary injunction.

In light of the contested factual issues, the public interest factor weighs in favor of neither party. The public has an interest in "'enforcing contractual obligations . . . between consenting parties.'" *Grimes & Co., Inc. v. Carlson*, No. 24-cv-11521-MRG, 2024 WL 5110193, at *9 (D. Mass. Dec. 12, 2024) (quoting *Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Servs., LLC*, 707 F. Supp. 2d 92, 112 (D. Mass. 2010)). But since each party asserts that the other materially breached the Subcontract and has unclean hands, and the strength of those arguments turns on disputed factual issues, the public interest factor is neutral.

On balance, given the lack of irreparable harm to TTC, the balance of the hardships favoring Elevate, and the disputed facts affecting whether TTC is likely to prevail on the merits, TTC's motion for a preliminary injunction must be denied.[2] Because the supplemental declarations and exhibits submitted by TTC with its reply brief do not change this conclusion, Elevate's motion to strike those declarations and exhibits is denied as well.

[2] Having so concluded, the Court does not address Elevate's argument that TTC's requested relief is barred by M.G.L. c. 214, § 1A.

## II. <u>**Elevate's Motion to Dismiss.**</u>

Elevate separately moves to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In evaluating such a motion, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted).

Count I asserts a declaratory judgment claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking, among other relief, an order declaring Elevate's termination notice invalid for failing to comply with Article 2.5.3 of the Subcontract. ECF 1, at 23. That statute, however, "creates a remedy, not a cause of action." *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (the Declaratory Judgment Act "created an opportunity . . . to grant a new form of relief" or "remedy"). It "makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis," but does not establish an independent claim. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 919 F.3d 638, 645 (1st Cir. 2019) (quotation marks omitted); *accord Alberto San, Inc. v. Consejo*

*De Titulares Del Condominio San Alberto*, 522 F.3d 1, 5 (1st Cir. 2008). Accordingly, Count I must be dismissed.

Counts II and III assert breach of contract claims, with the former requesting specific performance or injunctive relief and the latter alternatively seeking damages. In Elevate's telling, Count II is subject to dismissal because it, like Count I, only seeks a remedy and is duplicative of the other breach of contract claim in Count III. The allegations contained in Counts II and III regarding Elevate's purported breach of the Subcontract are identical. *Compare* ECF 1, ¶¶ 163-71, *with id.* ¶¶ 179-87. The sole difference between the two counts is the relief requested. *Compare id.* ¶¶ 172-78 (requesting "specific performance" and an "injunction"), *with id.* ¶ 188 (seeking "monetary loss and damage . . . equal to approximately $1 million dollars"). Dismissal is appropriate where a claim "merely duplicates" another claim, "provides [the plaintiff] with no further remedy," and "does not plead a [distinct] claim for relief." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 236-37 (1st Cir. 2013). Rather than dismiss Count II, however, the Court will treat Counts II and III as a single claim for breach of contract requesting alternative remedies. *See Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 353 n.3 (1st Cir. 2013) ("noting that injunctive relief is not a stand-alone cause of action" but reviewing "injunctive relief" count as asserting distinct statutory claims where complaint was "sufficiently clear" that plaintiff intended to do so).

To state a breach of contract claim, as discussed, TTC must plausibly allege that "'there was an agreement between the parties; the agreement was supported by consideration; [it] was ready, willing, and able to perform [its] part of the contract; [Elevate] committed a breach of the contract; and [it] suffered harm as a result.'" *Columbia Plaza Assocs. v. Ne. Univ.*, 493 Mass. 570, 581 (2024) (quoting *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016)). The complaint does just that.

It is undisputed that the Subcontract is a valid agreement entered into by the parties. *See* ECF 1, ¶ 39; ECF 1-2. TTC also plausibly alleges that Elevate violated Articles 1.5 and 2.5.3 by failing, respectively, to exercise Option Period 3 and to issue a compliant notice of termination.[3] Article 1.5 requires Elevate to "extend the [Subcontract's] term" if USAF "exercises its option period(s) with" Elevate and if, without any objections from USAF, TTC "has performed to [Elevate's] satisfaction." ECF 1-2, Art. 1.5. While USAF exercised Option 3 Period, Elevate did not modify the Subcontract to extend the term for the same one-year period even though, as alleged, "TTC faithfully performed all work required under the Subcontract and received consistently excellent performance ratings." ECF 1, ¶¶ 2, 55-56, 91, 115-20, 139, 166-67, 182-83. Meanwhile, Article 2.5.3 permits termination of the Subcontract if Elevate notifies TTC that TTC "is not performing to [its] satisfaction as determined by the [TTC] issued PWS service summary and deliverables"; it gives TTC at least fourteen days to cure "after receipt of the notice"; and TTC "fails to cure such Breach within this period." ECF 1-2, Art. 2.5.3. Despite invoking Article 2.5.3, Elevate's April 27, 2026 notice of termination does not identify any dissatisfaction with TTC's deliverables or afford TTC any time to cure the stated deficiencies. *See* ECF 1-3, at 4. Rather, the notice states that because the alleged breaches were "not capable of meaningful cure," Elevate "ha[d] no choice but to terminate the Subcontract for cause . . . effective at the conclusion of the current option period, i.e., as of close of business May 8, 2026." ECF 1-3, at 2, 4.

Elevate offers no argument contesting the plausibility of the Article 1.5 violation. *See* ECF 33, at 8 (asserting that this claim is "not plausible" without any supporting arguments); *Ramos-Ramos v. Jordán-Conde*, 171 F.4th 438, 443 (1st Cir. 2026) (deeming waived "off-hand

[3] In light of these plausible violations of the Subcontract, the Court need not consider whether Elevate additionally breached the non-solicitation provision in Article 2.6.

references" from a parties' brief that were "unaccompanied by any effort at developed argumentation" (citation modified)). It instead contends that TTC breached the Subcontract first by violating Articles 2.4.1, 2.10, and 2.13, and that, pursuant to Article 2.5.7, its termination notice thus did not need to comply with Article 2.5.3. This contention relies exclusively on the notice attached to the complaint. *See* ECF 1-3. But no allegation in the complaint itself supports Elevate's assertions in the notice of termination. To the contrary, TTC alleges that those assertions were "manufactured," "pretextual," "knowingly false," "substantively baseless," and made "in bad faith." ECF 1, ¶¶ 2-3, 85, 98, 113. TTC further alleges that Turner had the requisite authority to resolve the contested issues under Article 2.4.1, and that "TTC did not have any improper communications with [USAF] or Elevate's competitors about the Subcontract" in violation of Articles 2.10 or 2.13. *Id.* ¶¶ 99-109. These allegations are accepted as true on a motion to dismiss, and the pleading stage is not the appropriate time to resolve the parties' factual disputes.

The complaint further alleges that TTC was harmed by Elevate's breach of the Subcontract, suffering "monetary loss and damage, including but not limited to lost profits on the Subcontract, equal to approximately $1 million dollars." ECF 1, ¶ 188. Taken together, TTC's factual allegations state a plausible claim for breach of contract.

**CONCLUSIONS AND ORDERS**

For the foregoing reasons, TTC's motion for a preliminary injunction, ECF 7, and Elevate's motion to strike TTC's supplemental declarations and exhibits, ECF 46, are DENIED. Elevate's motion to dismiss, ECF 32, is GRANTED as to Count I and otherwise DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: August 25, 2026